May it please the court. My name is Brian Schroeder. I'm an assistant United States attorney in the District of Alaska, and I represent the United States on this matter. Your honors, you were provided us with a order last week, listing six different questions that you wanted to address at the oral argument. So if it pleases the court, I would just use that as the order of my presentation and address those questions. Question number one was whether the district court actually exercised its jurisdiction determined by the government to... We obviously authored the order. You don't need to read the question, your honor. This is the waiver issue. Do you want to address it? I do, your honor. We argue that this is not waived or forfeited, and there are four reasons why we believe that's the case. Tell us the first time that the government raised the dual sovereign defense. The first time the government raised the issue was in the objections to the initial report and recommendation. In our district, your honor, we often have the magistrate judge does an initial R&R, parties respond, and then they do a final R&R, and we have another opportunity to respond before it goes to the district court. So it was at the district, the first R&R. Okay. There are four reasons. First, your honor, that had the district court... Can you give us a citation to the record where that occurred? I do not have one. I'll provide that in a letter to the court. Your honor, the first reason we believe has not been waived or forfeited is if the district court had intended to waive or forfeit the argument, they would have needed to exercise their jurisdiction, and the one-sentence response that the court gave in that case was not sufficient to exercise the jurisdiction. You know, I was persuaded by that when I read your brief. I thought that was a pretty good argument. So then I went back to look at the district court order, and I thought he actually said a little bit more, so I would appreciate your comments on that. He finds the, with respect to the United States objections, he found and agreed with the persuasive response filed by the defendant. But then he follows on to basically say that he adopts the magistrate's findings and conclusions. And, of course, the magistrate's findings and conclusions don't address the additional issues that you have brought up, correct? That's correct, your honor. And so there's no mention of these additional issues. So in adopting the findings and conclusions, it seems to me when you combine that, where you have no mention of the additional issues plus the statement that is persuasive, that to me basically says the judge heard your argument, he found the other one more persuasive, and instead of saying that there's no waiver and I'm going to go in and address these, he adopts the findings of fact as stated. So explain to me why that isn't, in fact, an exercise of the discretion and taking into account your objections. Well, I think that's our point, your honor, is that he didn't use the term waiver, didn't use the term forfeiture. He didn't make any of those arguments. Well, he didn't need to use that. He basically adopts, the record was before him that this was a problem with forfeiture, waiver, however you want to state it. And then he says, I heard that, I find the other side more persuasive, and I adopt the findings and conclusions, which, of course, don't address your additional issues, because if he was going to consider those, it would have addressed the additional issues. But that's, I think, our second argument, your honor, is that he did say, I find the arguments of the defendant persuasive. The defendant had the opportunity in this case to fully brief the substantive issues, and the judge said, I found the defendant's arguments persuasive. But if you found him persuasive, then you need findings and conclusions, or at a minimum you need conclusions of law on those points. And he affirmatively adopted what the magistrate judge had already put in front of him. So that's why when I thought originally it was more persuasive, it seemed to me that the whole package tends to weigh against you. But maybe you have some more reasons, so I'm open to hear those as well. Well, your honor, I would just go back to the Ninth Circuit case law, which says that the judge cannot silently waive an argument that either party makes. And, in effect, that's what's happening here, because he's not addressing the dual sovereignty or the Blockberger argument, the same offense argument, by referring back to the magistrate's R&R, because, as you pointed out, the magistrate didn't address that, and he doesn't address it in his order. So basically those issues are never addressed. And the point you're making, your honor, is I think you're saying he addressed them silently by not dealing with them, and that's what he's not allowed to do under Ninth Circuit case law. If you were on the other foot, would you argue a waiver? Sure, but I probably wouldn't win. I'd expect that. The government argues waiver all the time. Certainly we do. Certainly we do, your honor. Where was the government? There's significant, complicated things. Where was the government at the beginning? Oh, on this issue? Yeah. No, I mean, I'm happy to explain that, your honor. I mean, that's not in the record anywhere, I don't think we made, but I'm happy to explain it. I mean, I think if, and you can also find, and I'd be happy to supplement this in the letter, too, in the record, because the magistrate judge ended up agreeing with us. The defendant briefed the conduct, the Sixth Amendment conduct argument, the argument of whether the conduct of the CI deliberately elicited the statements. That's what they moved to suppress. We briefed that line of cases in our responses. Once we got into the oral argument, I think it became obvious to us, and partly through some of the questions of the magistrate judge, that the scope of the statements was important. Whether the statements that the defendant made, which weren't directly attributable to his crimes, he didn't admit to his crimes, whether the scope of those statements was covered by the Sixth Amendment protection. We started taking a look at that issue, which led us to Texas v. Cobb, which talks about the inextricably intertwined idea. And then once we found Texas v. Cobb, that led to the line of cases on dual sovereignty. And if you look at those, and this is where the magistrate judge at one point agreed with us on the record, one line of those cases doesn't really cross over very well to the other. Now, I'm not going to stand here and tell the court I shouldn't have found that first line. I wish I would have, because I would have preferred not to put my CI on the stand in a criminal trial. But it wasn't because we didn't work on it, Your Honor. And those two lines of cases don't cross over very well. Have we gone through your four reasons, or are we at three still? Well, I think we've covered two, so we'll move on to the third. There's practical reasons why we think that the district court chose to rule, was appropriate for the district court to rule on the merits. Dual sovereignty argument wasn't inconsistent with any argument we made before. It had been additional. We weren't trying, I think the court realized, we weren't trying to sandbag the defendant, as I just gave you that long explanation for what happened. And all the parties had an opportunity to fully brief it. So the defendant wasn't prejudiced by the fact that we raised this at the point we raised it. And finally, I think the matter is a legal question, Your Honor. There's no additional factual develop needs to be had in this case. The defendant had a full opportunity to cross-examine both troopers that were involved in the case, as well as the CI, and ask them questions about government involvement, federal government involvement, all that. All that's been fleshed out in the record, and it's right to be considered as a legal question by this court. And, Your Honor, that practice is not uncommon. I mean, as we mentioned, things get raised after the initial or the R&Rs on occasion. And again, if you go back to the case we cited in our brief, Sung Jung Cha, recent case, you'll see that that's actually happened on a government issue, where this court agreed that it should have been heard, and then once it got to the circuit court level, agreed to deal with the issue. Your Honor, going to the second question, whether Texas v. Cobb applies where the defendant has not waived his Miranda rights. Fifth and sixth amendments, as the court is aware, have different roles. The sixth amendment, as we're discussing it in this case, right to counsel, has to do with having counsel at the key points during the prosecution. Fifth amendment, as we talk about Miranda, has to deal with dealing with coercion of a defendant or of a suspect when they're in a custodial atmosphere. Dual sovereignty cases involving the fifth amendment largely involve double jeopardy. Yes, Your Honor. I mean, if you ask a person on the street, if the state prosecutes you for a drug and weapon offense and you're acquitted, could the federal government then bring exactly the same charges if they had a parallel statute? And I think every person on the street would say, no, that's double jeopardy. But the case law says it's not. That's correct, Your Honor. But the right to counsel is fundamentally different, isn't it? It's significant. Yeah, it's a different issue, I would agree with you. And doesn't incorporating separate sovereign arguments or philosophy into the sixth amendment invite the government to interfere with the right to counsel? I think two points to that, Your Honor. I mean, I think what we're trying to argue here, what we've argued in our case, is what we believe the law to be more than we've argued the underpinnings of how it could go wrong. We're sitting here as a panel. There's a circuit split in the country with some circuits saying, yes, it does apply, other circuits saying, no, it doesn't apply. And so we have to make a decision. The Ninth Circuit has not ruled on the issue, first impression as far as we can determine. So tell me why applying separate sovereign to the sixth amendment context doesn't invite the government to interfere with the right to counsel? I guess I'm not understanding what you mean by interfere, Your Honor. Interfere with right to counsel. Well, exactly what happened here? I'd answer that two ways. One, I think, again, what we've tried to argue is the law. And if you analyze how the other circuits have looked at these cases, there's a series of seven circuits have analyzed it so far. Four have ruled that dual jeopardy does apply. Three have ruled against it. And I think if you look at the analysis by those courts, our position is that the four who have agreed that dual sovereignty applies have given it a careful analysis, and we believe a correct analysis, of the plain language of Cobb, which is the central point here. The other three cases, Mills, Redbird, and Kruger, really have not given that kind of analysis of the language in Cobb, which we believe is central to this. So we believe that this court should do it that way. Now, going back to your question. May I clarify, the language in Cobb is the single sentence? Yes, ma'am, the single sentence. But it's a powerful sentence, Your Honor, and that's our point. That there is no constitutional difference. That's a powerful phrase between offense as defined in double jeopardy and defined in right to counsel. I think that's a very powerful term. Getting back to your point, Your Honor, though, one of the ways, certainly there's concern, and I think certainly the government understands, and I think we addressed it in the brief, the concern about how this could be misused. If the court were to rule that dual sovereignty applied, how this could be misused. And I think we've looked at that a number of different ways. One, if you go, we analyzed it a little bit the way that Judge Justice Rehnquist did in Cobb. He had kind of what he called the parade of horribles argument was made to him in that case about the inextricably intertwined standard. He said, I've not seen this come to pass. And I think that's very applicable in this case because of the time difference between the cases we've seen. Cobb was decided in 2001. The first cases talking about double jeopardy and potential double jeopardy, not double jeopardy, but right to counsel and dual sovereignty happened in 2002. There was a number of cases that happened in 2005 and 2006, including Mills and Coker, which I think are the most instructive on either side. We've had now ten years, six or seven years, for that parade of horribles to happen, for government agents trying to do an end run around the Sixth Amendment. Nowhere have I seen it. The defendant hasn't pointed that out that that's happened, that the courts have found that. I think the defendant is arguing that's exactly what happened in this case. I think we would disagree that that's what happened in this case. The fundamental part of our argument, Your Honor, and the first argument we make when we responded to this, was there was no Sixth Amendment violation, that the state of Alaska, in this case, did... This is not a case of egregious government conduct. This is a case where the state of Alaska did everything they could to try to do this right. The agents met... And they were investigating a very serious offense here. I think it's important to note that, like a lot of other cases, and we've cited and the defense has cited, that this is not a case where they put the informant into the cell to ask questions about the charged crimes. They put the CI in the cell to ask about a very serious crime, a missing person they thought was dead. They coordinated with the DA's office before they did that. They got instructions from the DA's. They read those instructions to the CI in a recorded statement that the magistrate got a chance to hear at the hearing. Then, at the same time, they got search warrants, because under the state of Alaska law, they have to get search warrants to see the recording. So they did everything they could to do this right. And let me add another good point. His responses about the missing woman are not at issue here. I understand, Your Honor. But the statements he... I'm sorry. Is it your position, counsel, that you admit that the state police knew that Millsap was dead? No. No. Missing. Missing. Yes. But were they also attempting to investigate whether she might be somewhere else, might be held captive or something like that? My understanding, Your Honor, is they were investigating it as a missing person's case, and I understand that to be trying to find the person. You said that they thought she was dead. Oh, I think they believed she was dead at the time. They believed that was a possibility. Smith had made statements already about they were camping and she walked down the hill and he heard gunshots. So they certainly believed that was a possibility. Possibility. Yeah. A couple points I want to make, Your Honor. Also, unlike a number of the other cases that are cited as the precedent, in this case there was no incentive for the CI to get information about the charged defenses, because they told him when he went in, we can't use any of this. It's inadmissible to us. We cannot use it. So he had no incentive to do that. What's that, Your Honor? I thought the reason was he didn't tell the CI what the charges were. They did not tell him exactly. The CI testified at the hearing that he was aware that they were drug charges. It seemed to me one of the difficulties in separating things out is that if you have a CI who knows the rules and what the parameters are, then he can avoid and not avoid and not elicit. And you don't get in a situation here where it seems to me that it's somewhat jumbled because he doesn't really know the rules of the game. I'm not saying he's being disingenuous. I'm just saying he doesn't know the rules of the game. So I'd appreciate your response on that. Again, he did know when the officers talked to him, he was aware of the basic charges against him. They made a decision, I think it's our position, that I don't know how much of a difference it would have made for him to know the charges. If you tell him the charges, do you tell him the dates? Does he then start thinking about, well, if I ask about dates not inside that range, am I okay? I think it was a much more practical position for them to take to say, do not ask about the charged offenses. And then he deals with it that way.  This is not a case where the CI came in and testified about what Smith said, and we have to try to interpret that or whether that's culpable. What happened is we have it all on tape, and it's in transcripts. We've provided those to the court. You can read for yourself and make a decision, and that's, I think, our point, whether this was deliberately elicited or not deliberately elicited. Mr. Schroeder, I'm not so certain that we do have the transcripts. It seems to me that there's a section missing in the transcripts, not in the oral recordings, but in the transcripts, and I'll look for that and get back to you later. So anyway, we have that advantage. The court doesn't – you can read the transcripts yourself. You can decide whether he deliberately elicited, and I think that partially answers your question, Your Honor, is whether the lack of instructions led him into – because that's the real question. Did the lack of instruction lead to him deliberately eliciting statements? And we argue it did not. Volume 2 of the excerpt of the record stops at page 237, and Volume 3 doesn't begin until page 328, so it was about 91 pages. Your Honor, there was – I apologize for that. We were notified of – Could you supplement that? We will provide it. We were notified – I don't know, it was a few weeks ago that there was a gap, and I was pretty confident that we had done that at the time, that we had provided that missing material at the time, but we will make sure you get it. That was noticed a few weeks ago, and we were notified, and we provided that material, but we'll make sure that gets run to ground. As soon as possible, please. As soon as possible, yes, sir. Thank you. Your Honor, moving on to your third question. We argue that the dual sovereignty does apply in the Sixth Amendment right to counsel context, and I would go to your last question first. Your last question of that section was, is it even necessary to reach the question in this appeal? And it's certainly not. I mean, we've made three different points, three different arguments about why the motion or the suppression order ought to be overturned. The court can rule in our favor on any of the three, and we are perfectly happy with that. And as a matter of fact, if you go back and look at one of the cases we cited for a different reason, the U.S. v. Percy, there is a discussion of this court where they talk about they prefer not to reach the major constitutional issue if they don't have to, and we understand that. It's not that we prefer. We've been instructed. Yes, Your Honor. And our point is there was no deliberately illicit statements, there was no Sixth Amendment violation, and you can certainly reach the conclusion based upon that. However, as I said earlier, and some of this we've discussed. Is it possible, Mr. Schroeder, that there was a violation of the Sixth Amendment as to some of the conversations but not as to others of the conversations, and perhaps the test used by the magistrate and adopted by the court was an incorrect test and should be remanded so that under a correct test the court can filter those which are correct? We believe there were no statements that were deliberately elicited in violation of the Sixth Amendment. That doesn't come as a surprise. But I would agree with the court that the second part of the test applied by the magistrate judge, which was recommending to suppress nine different statements because of an improperly created atmosphere, that that is not the correct test. What is the correct test? The correct test is deliberately elicited, Your Honor. That's the correct test. Deliberately elicited. And that's the test that starts with Messiah and works its way down and I think is captured in this court. Does the adverb deliberately mean with deliberation as to the specific crime? Yes, Your Honor. I believe that's, if you go into the Fifth Circuit or the Sixth Amendment case law, you find, starting with McNeil v. Wisconsin, that Sixth Amendment right to counsel jurisprudence is offense specific. You will admit that, won't you, that the CI in this case was more than a mere fly on the wall? Oh, certainly, Your Honor. I mean, he didn't sit there and not say anything. I mean, that wouldn't have worked. He's like a mini agent provocateur kind of. I mean, he's massaging the conversation. I mean, he's not just sort of like whatever I hear. He's a proactive. I think we would argue that he's not, Your Honor. He's not a bump on the log. Well, let me answer. Is he a bump on the log when you read the transcript? No. No, but I think you'll find he's only proactive in those statements where he's asking about the girl. There he's proactive. I think if you go and listen to or read the transcripts for the other, you'll find him engaging in the conversation. But, I mean, a classic example of this is at one point the defendant in one of the conversations says he's reading the paper. And he says, oh, I love these Fred Meyer ads. They always have meth stuff on sale. And the C.I., who's probably not even listening, you know, not really paying that much attention, goes, huh? Well, but he goes to say more than that. He says, what do you mean by that? And he draws out some more conversation after the Fred Meyer meth sales is talked about. So he's actually provoking further development of what has been volunteered by the defendant. Perhaps the solution is to allow the first statement, which is not stimulated or deliberately induced by the C.I., and block out the second statement. Well, I mean, that's a possible solution. I don't know that I would agree that I think he's stimulated. I mean, I think there is that. I mean, he participates in the conversation. But I think, you know, another useful thing for the court to consider is that we provided a Rule 28J letter about a new case out of the Second Circuit called Jacques. And in that case, the court there looked at the conversation between the C.I., who happened to be a friend of the defendant, and who asked some questions, a couple times some pointed questions about the underlying offense that the defendant was in jail for. And that court said, well, what they looked at was the initiative. What was the initiative of the C.I.? Did they take initiative to get that information pulled? And said, if they're just asking a few questions in the flow of conversation, that doesn't mean they're taking the initiative to try to get this guy to talk about the charged offenses. And I think that's useful to the court. And I think that's also consistent with Coleman v. Wilson, where the Supreme Court in that case, the C.I. made a couple of comments, and the Circuit Court in that case suppressed the statements because of those few comments. When it got to the Supreme Court, they were looking more overall at what the C.I. was doing. And I think if you look at it in that way, I think the C.I. in this case, he followed the rules. He was told what the rules were. He followed the rules. But he certainly did participate in some conversations because it would have been unnatural not to. He was told what the rules were but given limited information about the scope. He wasn't told what Smith was charged with in the state, correct? He was. As I mentioned earlier, he was aware of Smith being in jail for methamphetamine offenses. But he wasn't told, for example, stay away from drugs and weapons charges. No. He was told stay away from the charged offenses. But he wasn't told what the charges were. But as I understand it, the agents knew of his awareness that they were drug charges. Okay. Your Honor, I have three minutes, 57 seconds, which I'll save for rebuttal. All right. Good morning, Your Honor. Your Honors, my name is Rich Kirtner. I represent Simon Smith in this case. And I, too, will also use the outline that the court has provided for argument today. And on the first waiver issue, I think it is important, as you recognize I think already, is that the district court decided this case not simply on waiver or they didn't make this argument. They looked at the entire record. And I would just refer the court in the excerpts of the record to the order from Chambers, pages 3 through 5, where the district court said they looked, they reviewed a lengthy evidentiary hearing over three days. The judge had transcripts of all the hearings. And as he indicated, it was fully briefed. He also references the objections filed by the government. And in his discussion, he again endorses that he's reviewed the entire file at page 2 of his order, including the objections of the United States. Now, I think that the government did waive these arguments after three days of hearings and all the briefing that went into this to raise this Texas v. Cobb issue after there was a full analysis and a full report and recommendation from the magistrate judge. However, the district court did not simply rely on that. The district court reviewed everything, the transcripts, all the briefing, including the objections, and decided that this was a Sixth Amendment violation, as the magistrate judge had indicated and recommended. Does it or should it make any difference in this case that the agents obtained a judicial warrant to place the wire? No, because I think it's still a violation of the Sixth Amendment, because what you have to remember in this particular case, the agents tried to interview Mr. Smith at the jail. And he said, no, I want my lawyer here. And his lawyer, in fact, contacted the state investigator and said, do not talk to my client without me being there. And then they plant a bug, have an FBI agent plant a bug in the cell, and then they have 400 hours of conversations over 23 days. So I don't think it's all cured by a state glass warrant. I think that it's clearly a Sixth Amendment violation under those circumstances. And now the second issue, then, is whether Texas v. COPS should apply when there is not a Miranda waiver. And I think that's a very important question, because if you look at all these cases, these seven and I submit eight cases that follow this issue from Texas v. COPS, all the cases the government is relying on, there was a Miranda waiver. And if you look at those cases and the discussion on this issue, it's important to recognize that the courts that applied the dual sovereignty doctrine under the circumstances on the cases the government is relying on talk about the importance of Fifth Amendment privileges and protections and how in all those cases there were Fifth Amendment protections and Miranda waivers that's different in this case, obviously. So getting to the third issue, first of all, I don't think that there's it does not apply without any kind of Miranda waiver. And I think that discussing the cases that the government has cited, that we have cited, I think that reinforces that argument. In the Burgess case, the 11th Circuit from 2008, there was a written Miranda waiver in that case. In the Alvarado decision the government relies on from the Fourth Circuit in 2006, there was two times Miranda waivers in those cases. In the Coker case the government relies on, I think it's critically important to read their concurring opinion in that particular decision, where in the concurring opinion the judge concurs because it's harmless error, but I think sets forth the analysis of why it should not be considered, Texas v. Cobb and dual sovereignty should not apply. And all the circumstances and the reasons why, which is it invites the type of violations and silver platter doctrine that we submit happen in this case. And there was a Miranda waiver. I think that the Mills case also endorses that view, talks about the fruit of the poisonous tree, how this type of application of Texas v. Cobb in these kinds of situations can invite abuse of constitutional rights, and talks about the Miranda waiver that was involved, and also makes the important point, and I think it was the concurrence in Coker that made the important point, that this doesn't apply on the Fourth Amendment or other Fifth Amendment issues. So I think those decisions are well-reasoned to say that the dual sovereignty doctrine should not apply in any circumstances. The Kruger case, the Redbird case, and we also cited U.S. v. Terrell, I think are other cases that support Mills in the decision-makings. Now I don't know if we necessarily have to go to the Bartkus exception in this case. Looking at Bartkus, it was basically based on double jeopardy and successive prosecutions. I think it's different here in what we're dealing with. The government suggests that there's no improper, no hint of improper collusion in this case, but we submit that the fact that it was the same agent in the state prosecution and the federal prosecution, the fact that the FBI was used to plant the bug, I think that there was the fact that they tried to talk the defendant. His lawyer said, you cannot talk to him without me. I think that that is a type of abuses that have been discussed with the cases that decided Texas v. Cobb should not apply. Can I ask you a factual question? Yes. I think you're correct from the record that the FBI agent actually placed the wire. Yes. Smith was the object of attention from a fugitive task force or something like that? Yes. Does the record tell us whether there was any federal involvement in that task force? I can't recall. I know some of the agents were questioning it. I can't recall exactly what the federal, because it was – Perhaps you could supplement on that. I could supplement that, because it was my impression that the FBI, the agents looking at the missing person were working hand in hand with the state troopers that were investigating the drug cases, and this was all hand in hand from the beginning through the end and still ongoing. Is it correct that the record suggests the reason the prosecution of Smith was handed over to the feds, because the feds had superior penalties? I don't think so. I think it was because it seemed clear that there was a violation under state law, the Sixth Amendment violation under state law. And so, I mean, this is an example. My client's got an attorney in state court. They violate the Sixth Amendment rights by, as this court has found, the district court has found, and then so then they take it to federal court on basically the same charges. And so I think that's the purpose of – There are a couple that are not the same, right, the felon in possession charges? There are some distinguishing factors from some of the charges. And, you know, the court never went through the Blackburger comparison on this record. So there's some charges that are identical. The circumstances are certainly the same, but there hasn't been that direct analysis. But, you know, then the statements that should be suppressed under the Sixth Amendment, they'd have to sever the counts for those who, you know, that are the same from those who aren't the same. When we go down the decision chain, we ultimately get to deliberate elicitation, don't we? Yes. What's your response to Judge Bea's earlier question to your opposing counsel about whether the magistrate judge applied the correct standard? I think the judge – the district court and the magistrate judge absolutely did apply the same standard. I mean, if you look at the decision, the report and recommendation, it followed well-settled Supreme Court cases from Messiah through Henry. It looked at the factors under Henry. It looked at the Ninth Circuit, a well-settled law under Randolph v. People. It took all those settled standards of analysis, and it reviewed three days of hearings. It reviewed all the transcripts, and it made the findings. But, Counsel Randolph, the language that I was taken by was that, first, the defendant must show that the informant was acting as an agent of the state when he obtained the testimony. No question about that. There's no question there. And, second, that the informant made some effort, quote, to stimulate conversations about the crime charged. Now, if he stimulates conversations about Milsap, and Smith volunteers that part of the reason why he had to get rid of Milsap was that she was on drugs and using too many drugs that he was giving her, would you say that that also has to be suppressed? Well, the questions about Milsap are not part of this case. And so all the statements that the government ---- So if he stimulates conversations about Milsap, that's okay? No. Well, it's not an issue at this case because all the ---- It's an issue because that's what he's there for.  If we take conversation by conversation ---- Yes. What should the magistrate judge do? Maybe. I thought the magistrate said any conversation where the informant was, the CI was, is barred. Now, you didn't go through the content of each conversation and say, did the CI stimulate conversations about the crime charged? That may be a problem for you. No, I don't think so, Your Honor. I think if you look at the report and recommendation in the excerpts of the record, the judge, the magistrate judge, looked at each individual conversation and decided, I think, nine of the conversations, six of the conversations that she analyzed, and her finding of fact was that the confidential informant deliberately elicited those conversations. Those conversations about the crime charged or conversations? Yes, about the crimes charged. That's her finding on six specified conversations. Then she went on to hold nine other conversations, and she refers to them by reviewing the transcripts and going to the dates and times of those conversations, that she found that there were, under circumstances, under Randolph, that were likely to induce discriminating statements. Now, there were two, in fact, there were two conversations that the magistrate judge found that there was a Coleman type of situation, a listing post, because the confidential informant wasn't there. And so we're not contesting that fact, but she made that distinction between 15 conversations and those other two. Let's try to separate two types of conversations. One, conversations which are, seek to stimulate admissions about the crime charged. That's one. Yes. And conversations likely to induce, likely to induce confessions, but not about the crime charged. As to the latter, did the magistrate apply the right rule? I say yes. Under Randolph, that stimulate conversations about the crime charged. If they're simply conversations which seek to stimulate conversations about crimes generally or crimes other, then they wouldn't come under Randolph, would they? No. Thank you. That concession is very important. Thank you. Now, the question Judge Bea asked you earlier about, let's say the CI starts talking about drugs, they're engaged in a conversation, and in the middle of the conversation about drugs, Smith says, that's the reason we got rid of Millsap. Did that happen? No. It did not happen in this case. The government, separate question, the government, I think, argues that some of these statements were simply blurted out, not in response to questions. Is that, what's your position on that? Well, I think that you have to look at all these circumstances. Here you have an informant that's purposely planted in the cell with the client for over three weeks, has established a position of trust, a connection, a friendship where my client trusts the informant, where over a whole course of time that these statements are, at the beginning, elicited, and then other statements follow from that. And I think that it's important to note when the magistrate judge found that some of these statements were elicited by the confidential informant, that was from the very first day of these recordings. Let's suppose that, I know that's not this, what I'm about to describe is not this case, but let's suppose that the CIA, before he ever went in the cell, sat down with the agents and a deputy prosecutor or an assistant U.S. attorney or whatever, somebody with legal knowledge, and was told that Smith is charged with drug and weapons charges. Here's a copy of the indictment. Read it before you go in. You are not to talk with him about those charges at all. We're trying to find out if Millsap is still alive, and if so, where she is. And we think this guy has that information. So with that warning, the CIA goes in, and they're engaged in a conversation about drugs, and in the middle of it, he blurts out stuff about Millsap. Where would we be on that? That would be a different factor. That would be an important factor for you to consider. And it's important in this case that that's not what happened, that they didn't inform the informant of what the charges were, that he had no knowledge of that. That came out in the hearing in something the magistrate judged. No knowledge, but I thought your opponent argued that he talked about, the CIA talked about the charges with the agents. Is that right? Just vaguely, because if you read the transcripts of the confidential informant testifying, and the question was asked, do you remember, do you know, were you informed of what Mr. Smith was charged with? He said no. And also the agent didn't. Well, the question I have then is, if you look at the order following on, and what you're saying about non-advising of the specific charges so that he was uncertain, he says the government created this atmosphere likely to induce incriminating statements, but then goes on to state that, therefore, any statements related to the charged crimes cannot be admitted. What is the legal basis for jumping from A to B? Well, I think that it's sort of like when you violate somebody's Fifth Amendment privileges, and then you continue to ask questions, and then you go back without a Miranda warning. It's a continuing violation. It's already been set up by the first violation. In this case, at the very beginning, they created a Sixth Amendment violation and a Fifth Amendment violation, and then they go on and it just carries on without anything to support or reinforce the defendant's rights under the Fifth or Sixth Amendment. So I think that it's an ongoing course of conduct. So the first part is where there's a finding that there's deliberate setting up or inducement. So those are separate. So you're basically saying that this, what did they say, creating the... Likely to induce. Likely to induce incriminating statements, that that basically sweeps in everything else, basically, other than the couple where the ECI wasn't present. The magistrate judge was careful to use both standards and to separate those and to distinguish what she found was actually at the level of deliberate elicitation. And then to go one step further in looking at all the circumstances, another number of conversations under the standard of likely to induce incriminating statements. So that's how the report and recommendation is laid out. That's the analysis that the district court accepted, and I think it's conclusions of law that are based on the facts that are not in dispute because we have transcripts and we have testimony. It's a well-founded record, and I don't think that those can be disturbed. The district court judge looked at all that. He felt that those conclusions of law are well supported. I agree with you as to the first six statements, the deliberate intent to induce statements about drugs and gun possession. But the standard likely to induce incriminating statements by itself seems to include likely to induce incriminating statements about mail pass to the same woman. And therefore is not sufficiently narrowly tailored to follow the mandate of Randolph, which is to stimulate conversations about the crime charged. I think one thing that's important to remember, 400 hours of taped conversations. Then they sort out the statements that are going to be useful in this federal prosecution on drugs and guns, which is basically the same charges. How many conversations were elicited about Milsap that are not part of this record because the government did not want to introduce them in this case? That is not in this record. That's an unknown. They took 400 hours of conversation, said these 17 conversations we want to use in this federal prosecution. And the district court said 15 of those you can't use because it's a Sixth Amendment violation. I think I've finished the outline. If you have any other questions, can I quit early? We welcome that. Thank you for completely covering everything. You have some time for rebuttal. You're on three things. Three things I wanted to point out, and then if you have any questions, I'll answer those as well, obviously. Number one, we certainly did not agree with defense counsel that the CI didn't have any knowledge of what the charges against the defendant were. As I stated, he wasn't instructed on that, but he did have knowledge. At least they were methamphetamine related charges, and I would cite the court to excerpt of record page 195 where the CI is cross-examined on that. So the CI knew that the state charges involved drugs? Yes. And was he told not to talk about that, not to question Smith or to get Smith to talk about that? He was told not to question him about the charged offenses. No mention of weapons? I don't believe there's any mention of weapons. We'll go back and look for that. We'll supplement, Your Honor. And one other quick thing, and I want to make sure that there's no implication here that there's something untoward about this idea of us having 400 hours of tape and only providing 17 sections. Your Honor, the defense had all 400 hours. If there's something in there they have a problem with, then they have the opportunity to point it out. I think we're here just on the statements the government wanted to put in. We are, Your Honor. It almost sounded like there was some implication that we were trying to hide something, and I want to make it very clear that we were not hiding anything. Almost everything in here has been on tape. And then the last thing I want to talk about is the standard, whether it's deliberately elicited or creating an atmosphere. And I think the best thing for the court to look at is the Ninth Circuit's own test on that, which is Randolph. And Randolph says two-step tests. You have to be an agent, and you have to be doing something to stimulate conversations. We would certainly equate that to conversations about the crime charge, Your Honor. Because, as we know from McNeil and from Cobb, Sixth Amendment violations are offense-specific. So it's got to be about the offenses. The standard is not whether the government created some kind of atmosphere. As a matter of fact, it's interesting, if you look at Randolph, what you see is the discussion of an atmosphere is right above where they lay out the two-part test. And the court in that instance says, you know, if you create this atmosphere, government, you may be setting yourself up for a problem, but the test is still whether the CI did something to elicit the statement. That's the test. And that is not what the court found on at least the nine statements. In this case, the nine statements where they found it was just an atmosphere. And our position is that the court didn't, if the court were to look de novo at the solicited, the statements that the magistrate found were deliberately elicited, you'll find they weren't, the statements weren't deliberately elicited, and that the CI was just doing his job. Should we look at it de novo? Should we remand the district court to look at it de novo? No, I think the court should look at it de novo, Your Honor, because if we send it back to remand, in essence, we're going to end up back here on essentially the same record. The record's been fleshed out. The factual statements have been fleshed out. The law is the same. It's more efficient for this court to handle it now. And I would go back and cite another case. Aren't there factual underpinnings to that conclusion? That's my question. I don't think so, Your Honor. I think what's been fleshed out as far as whether it was deliberately elicited or not deliberately elicited or whether there's been involved, I'm not sure what the other facts would be. Well, wouldn't each conversation have to be analyzed under either the Randolph language, which I quoted over and over again, or the government creating the atmosphere language? If creating the atmosphere language is wrong, as you say, then the district court should have another look at it under the correct language, shouldn't it? Well, Your Honor, I think the district court agreed. The context is very important. No, I understand, Your Honor. The magistrate judge has done that, in our opinion, incorrectly. The district court agreed with that in signing off on the order. We think it's time for this court to deal with it. Well, let me ask you, your view that the magistrate judge made a mistake by benchmarking the conversations against the wrong standard with respect to the atmosphere or that there was the correct standard, but there was clear error in how conversations were benchmarked against that standard? Both, Your Honor, because the magistrate judge found suppressed for two different reasons. So the conversations she suppressed because of an improperly created atmosphere. That's the only ones I'm talking about with my question. Okay, then that's the wrong standard, and she did not make a ruling on deliberately elicited that I remember related to those statements. On those not. On those. But, I mean, I would argue that the reason she didn't make a ruling that whether they were deliberately elicited is because they weren't. I mean, the ones that were deliberately elicited she put into that category. She had a number of remaining, and she put them into a second category of created atmosphere, which is not the right standard. And your position is that it's deliberately elicited findings of the Toronto Court Magistrate. Those were in error. That's correct. One quick question. Would we have to listen to all 400 hours to make a de novo judgment? No, Your Honor. I think you can listen. I don't know that we've provided the actual tapes. We can do that. We have the transcripts of all the 17 conversations that we've laid out, and I think all you need to do is read those transcripts, and you'll see them. But you don't have the transcripts from those pages 237 to 320. We will make sure. I swear to you, Your Honor, we thought we had provided those. We dealt with that. We thought we dealt with it, and we will make sure it's done. Thank you. If I have to bring them back over here to you personally this afternoon, you will have them. All right. Thank you for your arguments, both of you. The case of United States v. Smith is submitted. We'll take a brief recess. The attorneys for the next case, Byrd v. Honeywell, can get set up.
judges: Hawkins, McKeown, Bea